**In re David T. DAVIS & Margaret S. Davis, Debtors.**

**Global Express Money Orders, Inc., Plaintiff,**

**v.**

**David T. Davis & Margaret S. Davis, Defendants.**

**Bankruptcy No. 00–31562–T.**
**Adversary No. 00–3079.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

May 7, 2001.

**676**

Robert B. McEntee, Jr., Richmond, VA, for David T. Davis & Margaret S. Davis.

Robert L. Harris, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, VA, for Global Express Money Orders, Inc.

Keith L. Phillips, Richmond, VA, Chapter 7 Trustee.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

Trial was held December 7, 2000, on the plaintiff Global Express Money Orders, Inc.'s (Global) complaint for determination of dischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(B) and (a)(4). At the conclusion of trial the plaintiff withdrew its complaint against debtor/defendant Margaret S. Davis, and the court ruled that the complaint would be dismissed as to her. The court deferred ruling as to debtor/defendant David T. Davis and requested the parties to file proposed findings of fact and conclusions of law, which have now been received.

For reasons stated in this opinion, judgment will be entered against debtor David T. Davis excepting his indebtedness to plaintiff from discharge under both counts of the complaint.

### Findings of Fact.

During the times relevant to this adversary proceeding, debtor Mr. Davis was the manager and 90% equity owner of Davis Investments, L.L.C., a Virginia limited liability company d/b/a Eagle Markets; the firm operated several convenience store-gas stations in the Richmond area. Debtor Mrs. Davis owned the other 10% equity.

The operations manager for Davis Investments was Mr. Dana Wood, a college friend of Mr. Davis.

As part of its convenience store operations, Davis Investments sold money orders. Before contracting with plaintiff Global, Davis Investments sold money orders of Travelers Express. This business arrangement was terminated by Travelers prior to February 1999. Davis Investments decided to change from Travelers to Global because Global's practice was to "sweep" the money order proceeds once each week, whereas Travelers made its "sweep" twice weekly.

Global, a Maryland corporation licensed to do business in Virginia, sells money orders from machines that are installed in business locations. In early 1999, Global and Davis Investments negotiated for an agreement under which Davis Investments would allow the installation in its stores of Global money order machines. The agreement included the personal indemnity and guarantee of payment by Mr. and Mrs. Davis.

A representative of Global, D.T. Bosher, went to one of the Richmond locations of Davis Investments and picked up its application and the contract between the par-

ties, a trust agreement. The agreement had been signed by debtor, and he was present when the instrument was delivered to Bosher. Later, Bosher learned and informed someone at Davis Investments that Global would require a personal financial statement of debtors.

Debtor Mr. Davis had two identical financial statements reflecting the Davises' assets and liabilities; one was dated March 1, 1998, and the other November 18, 1998. The statement of March 1 had been prepared by Davis and another individual. A copy of the statement of November 18, 1998, unsigned, was delivered to Bosher in Richmond around mid-February 1999; debtor was present at the time and authorized the delivery of the statement.

The financial statement was subsequently reviewed by Global's chief financial officer located in Baltimore, Maryland. Because Davis Investments was a fairly new entity and its credit was being indemnified by its owners, the personal financial statement of the company's owners was material to Global's decision to do business with it. Global's financial officer examined the Davises' tangible net worth revealed by their financial statement prior to deciding whether Davis Investments was a reasonable credit risk and whether Global would do business with the company.

The information on the Davises' personal financial statement delivered to Global was incorrect in the following respects:

(1) the statement reflected cash in a checking account in the amount of $45,000.00. On the delivery date, the account balance was $3,355.00;

(2) The statement values the Davises' personal residence at $340,000.00. Their bankruptcy petition values the residence at $275,000.00;

(3) The statement values a beach condominium at $182,000.00. Their bank-

ruptcy petition places a value of $91,000.00;

(4) The statement values the Davises' equity in Davis Investments at $303,000.00. Their 1998 federal income tax return reflects a capital account in the business of negative $109,000.00;

(5) The statement values the Davises' interest in another of their businesses, Davis Oil, at $60,000.00. In fact, this company had no appreciable value and is not reflected in the bankruptcy schedules;

(6) The statement reveals that the Davises held mutual funds in the amount of $37,000.00. In fact, they had no mutual funds on November 18, 1998, or subsequently; and

(7) The statement reveals that the Davises were due a federal tax refund of $22,000.00 in 1998. Their 1997 return reflects a refund of $2,071.00.

Because of these incorrect asset entries on the financial statement, the statement was materially false.

On February 19, 1999, Global and Davis Investments completed execution of a document, entitled "Trust Agreement." This agreement authorized Davis Investments to sell Global money orders. Under the trust agreement, the sales proceeds received by Davis Investments from money order sales were required to be held in trust for Global. The agreement required Davis Investments to hold these proceeds in a separate trust bank account for Global. Additionally, Davis Investments was to remit payment of all money order proceeds to Global once each week; the company was not to use these funds for its own obligations or those of its owners.

Mr. and Mrs. Davis executed a personal indemnity and guaranty, by which they

guaranteed all payments due Global under the trust agreement along with Davis Investments' performance of all its other obligations under the agreement.

Upon its commencement of Global money order sales, Davis Investments immediately breached the agreement by failing to separate Global proceeds or deposit them in a separate trust account. Money order receipts were placed in the same cash drawer as other receipts, and the firm deposited the commingled receipts in a general operating checking account at The Community Bank. All debts and payroll of the company were paid out of this account. Funds from the account were also used by Mr. Davis. Although Davis and his operating manager, Dana Wood, were the only individuals with authority to sign checks on this account, various creditors of Davis Investments had the authority to draw on the account.

Within thirty days after execution of the trust agreement, Davis Investments breached the agreement by defaulting in its payment of sums owed to Global for money order sales, and within sixty days Global had canceled the agreement due to the continuing defaults. Davis Investments presently owes Global $71,168.55, representing unpaid money order proceeds covered by the trust agreement. Mr. Davis is personally liable for this debt under his indemnity and guarantee of payment.

Mr. and Mrs. Davis filed this chapter 7 bankruptcy petition on March 14, 2000.

Additional findings of facts are stated below.

### Discussion and Conclusions of Law.

 Plaintiff Global's complaint asks the court to except from debtor Davis' chapter 7 discharge his personal liability for the Davis Investments indebtedness of $71,168.55, pursuant to (1) 11 U.S.C. § 523(a)(2)(B) based on this debtor's submission to Global of a false financial statement and (2) 11 U.S.C. § 523(a)(4) based on Davis Investments' failure to comply with its trust agreement with Global. The burden of proof on both counts rests with the plaintiff.

The court's rulings on both issues has largely been decided within the findings of fact set out above. Because there were conflicts between testimony of plaintiff's and defendants' witnesses, the court will first comment on these findings.

### 1. *Plaintiff's Witnesses.*

D.T. Bosher, a Global employee, testified that he picked up Davis Investments' application and the signed trust agreement at one of the stores; he had met debtor on several occasions prior to installing Global money order machines; later, Global required the financial statement; he believed debtor was present when the statement was delivered to him.

Global's chief financial officer, John Todd, testified that before entering into the agreement, Global had required debtor's personal financial statement because Davis Investments was a new entity; he reviewed the statement closely and in approving Global's entering into the agreement he relied on the entries in the statement for cash in checking account, the Davises' real property, the mutual fund, and tax refund. He would not have approved the credit if these entries had been accurately stated.

### 2. *Defendants' Witnesses.*

Debtor Mr. Davis relied upon his own testimony and that of his operations manager, Dana Wood. The court found both witnesses, particularly Davis, evasive and lacking in credibility. Davis claimed to have little or no knowledge surrounding

negotiation of the Global trust agreement or of day-to-day business operations of Davis Investments; he stated that he relied upon Wood for these activities. Yet, Wood, who testified that he had negotiated the Global money order trust agreement and made bank deposits of company revenues, claimed he knew nothing about the requirement for money order revenues to be deposited in a separate trust fund account. Wood's claim of ignorance about a key provision of an agreement he supposedly negotiated was not persuasive, particularly in light of Mr. Davis' own disclaimers. Thus, the combined testimony of debtor and Wood was inherently implausible and not believable in crucial areas.

This applies as well to the testimony regarding the Davis financial statement. Davis disclaimed any knowledge of how the statement of November 18, 1998, came to be given to Global; such matters were handled by his office staff; he was too busy doing other things; he did not meet Global's on-site representative, Bosher, until Bosher was installing the money order machines; Davis acknowledged the inaccuracy of the November 18 statement delivered to Global but said he did not know its origin. Wood testified that he did not know of the requirement for the financial statement or how the statement was delivered to Bosher.

## I. *Analysis of False Financial Statement pursuant to 11 U.S.C. § 523(a)(2)(B).*

■ The following five elements are required to prove a debt excepted from discharge under § 523(a)(2)(B):

(1) the debt was obtained by the use of a writing;

(2) that was materially false;

(3) respecting the debtor's or an insider's financial condition;

(4) on which the creditor to whom the debtor is liable for money, property, services, or credit reasonably relied; and

(5) that the debtor caused to be published with the intent to deceive.

*See Southeast Associates of Durham v. Jacobe (In re Jacobe),* 121 B.R. 299, 303–04 (Bankr.E.D.Va.1990) (citations omitted).

In *Jacobe,* this court held that the plaintiff must also "... prove the debtor was under a duty to furnish a financial statement as part of the credit transaction." 121 B.R. at 304 (citation omitted).

■ The court finds that Davis' financial statement of November 18, 1998, was materially false, as set out above. In fact, at trial, Davis did not seriously question the inaccuracy of the statement. Rather, he tried to distance himself from its preparation and delivery to Global.

The court further finds that Global required the personal financial statement of debtors as a condition precedent of the business arrangement; that Davis, with intent to deceive, published the materially-false financial statement and caused it to be delivered to Global; and that in contracting with Davis Investments and allowing the entity to incur substantial indebtedness, Global reasonably relied upon materially-false asset entries in the financial statement, which debt was indemnified by Davis personally.

The court rejects Davis' argument that plaintiff has failed to prove he prepared the financial statement and authorized its delivery, *i.e.,* publication with intent to deceive, to Global. The evidence shows that in Davis' presence and with his knowledge, the financial statement was delivered to Global by an (unknown) employee of Davis Investments. This evidence was sufficient to require some better explanation from Davis than he provided.

Further, the court does not believe Davis' evasive testimony that he was too busy to be bothered and knew nothing about the contents of the financial statement of November 18, 1998, or the circumstances surrounding its delivery to Global. Davis testified that he did not meet Global's representative Bosher until Bosher was installing the machines after the transaction had already been approved. Bosher, however, testified that he had met Davis on several occasions prior to installing the machines, and he believed that Davis was present at the time he picked up the financial statement.

In summary, in light of Davis' overall evasive testimony, the court finds that Bosher's testimony was sufficient to carry Global's burden of proof as to the issue of Davis' willful intent to deceive Global with the statement. If Davis were telling the truth, he should have been able to present corroborating testimony from other employees, even his operations manager Wood, but yet, Davis failed to do so.

■ At the very least, Davis recklessly allowed his financial statement to be used by Global for its consideration of the business transaction, and his reckless indifference is sufficient to satisfy the publication with intent to deceive element of § 523(a)(2)(B). *See Insurance Co. of N.A. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119 (3d Cir.1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir.1994); *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993); *see also Consolidated Bank & Trust Co. v. Dalton (In re Dalton)*, No. 99–1330, 205 F.3d 1332, 2000 WL 191850, at *3 (4th Cir. Feb. 17, 2000) (unpublished).

Three remaining arguments of debtor require comment.

**A. *Material Falsity of Financial Statement.***

■ A materially-false financial statement is "one that 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *Riggs Nat'l Bank v. Ross (In re Ross)*, 180 B.R. 121, 127 (Bankr. E.D.Va.1994), *aff'd*, 199 B.R. 576 (E.D.Va. 1995) (citation omitted).

The court concludes that Davis' gross overstatement of the asset values in the financial statement constituted material falsity.

**B. *Reasonable Reliance.***

■ The reasonable reliance requirement is often satisfied by evidence that the credit would not have been extended if accurate financial information had been disclosed. *See In re Coughlin*, 27 B.R. 632, 637 (1st Cir. BAP 1983). However, the court must consider all surrounding circumstances, including whether information available to the creditor indicates that further inquiry should be made. *See Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659, 662 (8th Cir.1994); *Smith v. Cunningham (In re Cunningham)*, 163 B.R. 657, 661 (Bankr.D.Mass.1994); *Shawmut Bank, N.A. v. Goodrich (In re Goodrich)*, 999 F.2d 22, 24–25 (1st Cir.1993); *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993). The creditor failing to pursue warning signs risks the court's finding lack of reasonable reliance. *See 4 Collier on Bankruptcy* ¶ 523.08[2][d] (Lawrence P. King ed., 15th ed. rev.2001).

Davis argues that Global did not reasonably rely on the financial statement because it was unsigned and also dated several months prior to delivery to Global. He asserts that these factors required

Global to further investigate the contents of the statement.

Plaintiff's financial officer, Todd, testified that he performed outside investigation of the financial statement by obtaining Equifax credit reports and various unspecified vendor references. Otherwise, Todd accepted the statement at face value and relied upon just four of the asset values set out in the statement, *i.e.*, values for the checking account, real estate, mutual fund, and tax refund. The witness stated that he would not have approved the agreement if Davis' financial statement had stated the correct values of these assets.[1]

■ The financial statement dated November 18, 1998, was three months-old when delivered to Global in mid-February 1999. The court does not agree with Davis' assertion that the age of the statement in itself precluded Global's reasonable reliance.[2] Rather, the reasonable reliance analysis must depend on specific entries, and the court agrees with Davis that Global could not have reasonably relied on the November 18 statement as to the value of a checking account or the 1997 tax refund. A checking account can materially vary from month to month, and the impact of Davis' 1997 tax refund in March 1999 is doubtful. Given the date of the statement, Global clearly should have inquired further about these assets.

■ The remaining assets meriting comment are the overstated real estate values and the nonexistent mutual fund. There is a total discrepancy between the real property values in the financial statement and the bankruptcy petition values of $156,000.00. In the court's view, the amount of discrepancy is material, not inadvertent, and Global was under no duty to inquire further about these assets. Similarly, the mutual fund by itself was a substantial asset overstatement, which Global could have relied upon. The court therefore concludes that Global reasonably relied on materially-false asset entries in the Davises' financial statement. Reliance on these assets was not obviated by the fact that the statement was three months-old.

C. *Damages.*

■ Davis argues that the loss of payment to Global of the trust balance due is not damage or loss resulting from his publication of the false financial statement, as required by the statute. Rather, he says, the loss resulted from the failure of store employees to separate money order sales. Moreover, according to Davis, the Davis Investments' stores were not generating enough revenue to pay the current liabilities. Finally, Davis asserts that there is no evidence that he personally took funds or caused the shortage.

---

1. The witness also testified that he relied on Davis' life insurance cash surrender values. However, Global's brief does not argue these values were materially false. More notably, Global's witness did not rely on what the court considers the most blatantly false entries, the valuation of Davis' business interests at a total of $366,000.00 when they had no value.

2. For cases on the time differential between the dated financial statement and delivery to the creditor, *see Karve Family Ltd. P'ship v. Mowji (In re Mowji)*, 224 B.R. 221, 227 (Bankr.M.D.Fla.1998) (finding that financial statements four to six months-old are stale and should not be relied upon by creditor without attempt to verify); *Allstate Ins. Co. v. Delgado (In re Delgado)*, 151 B.R. 618, 622 (Bankr.S.D.Fla.1993) (stating that five month-old financial statement could not be relied upon by creditor). *But cf. First American Bank of Indian River Co. v. Schraw (In re Schraw)*, 136 B.R. 301, 305 (Bankr.S.D.Fla. 1992) (holding that two month-old financial statement was submitted to bank within "reasonable proximity" to loan application; thus, bank's reliance was deemed reasonable).

In light of the court's findings of fact, it is ironic that Davis can argue that it was his employees who failed to comply with the trust agreement requirement for segregating trust fund receipts of Global. His arguments are beside the point. Davis agreed to indemnify Global for Davis Investments' indebtedness under the trust agreement, and his inability to make good on the indemnity is a direct result of his financial problems and ensuing bankruptcy: this is the causal link, if one is even necessary, between Global's losses and Davis' financial condition.

Courts have split on whether there is a causation element in a § 523(a)(2)(B) analysis. In *Siriani v. Northwestern Nat'l Ins. Co.(In re Siriani)*, the Ninth Circuit held that the creditor must prove fraud was the proximate cause of loss. *See* 967 F.2d 302, 306 (9th Cir.1992). However, several decisions have rejected the view that § 523(a)(2)(B) contains a damage or proximate causation element. *See, e.g., In re McFarland*, 84 F.3d 943, 947 (7th Cir. 1996), *citing Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 29 n. 6 (5th Cir.1995); *Shawmut*, 999 F.2d at 24–25.

Although this court does not find causation a necessary or proper element of the false financial statement issue, my findings make clear that debtor's false financial statement was a proximate cause of Global's loss.

## II. *Defalcation While Acting in Fiduciary Capacity under 11 U.S.C. § 523(A)(4).*

■ This code section excepts from a debtor's discharge any debt "... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny...." 11 U.S.C. § 523(a)(4).

Plaintiff's position is that Davis was in a fiduciary relationship to Global by virtue of his position as major stockholder, director and president of Davis Investments, and because of his personal indemnity of the Global debt. It is asserted that Davis, as a fiduciary under the trust agreement, failed to account for and pay over Global's money order receipts; violated his promise to segregate the trust funds from operating funds of Davis Investments; allowed the stores' revenues to be commingled with the trust funds; and used the combined revenues to pay his company's operating expenses, including his salary and other personal expenses.

■ In order for Global to prevail under § 523(a)(4), it must prove (1) that the debt in issue arose while Davis was acting in a fiduciary capacity and (2) that the debt was incurred by his fraud or defalcation. *See Bellity v. Wolfington (In re Wolfington)*, 48 B.R. 920, 923 (Bankr. E.D.Pa.1985), *citing Aetna Ins. Co. v. Byrd (In re Byrd)*, 15 B.R. 154, 155 (Bankr.E.D.Va.1981). In the bankruptcy context, the term "fiduciary" is narrowly construed, and "fiduciary capacity" is limited to actions by individuals under express or technical trusts that are in existence before the defalcation upon which the claim is based. In other words, the exception from discharge applies "... only to a debt created by a person who was already a fiduciary when the debt was created." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (citation omitted); *see also In re Marchiando*, 13 F.3d 1111, 1115–16 (7th Cir. 1994); *Berres v. Bruning (In re Bruning)*, 143 B.R. 253, 254 (D.Colo.1992); *Merrywell v. Barwick (In re Barwick)*, 24 B.R. 703, 705–06 (Bankr.E.D.Va.1982); *Borg–Warner Acceptance Corp. v. Miles (In re Miles)*, 5 B.R. 458, 460 (Bankr.E.D.Va. 1980) (citations omitted); 4 *Collier on Bankruptcy* at ¶ 523.10[1][c].

Whether debtor was acting in a "fiduciary capacity" is ultimately a question of federal law, but state law must also be considered. *See Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 155–56 (Bankr.D.Md.1999); *Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 813 (Bankr. E.D.Va.1997).

The trust agreement here provides that it is governed by Maryland law. It has not been disputed that the agreement created an express trust with Davis Investments as trustee and Global as beneficiary.[3] This trust arose before the debt was incurred by Davis Investments' failure to comply with the trust terms. The critical issue is whether Davis in his individual capacity was also a fiduciary under the trust and thus personally liable for the debt in question.

Davis argues that he was not a fiduciary and that even if he were, there is no evidence of any wrongdoing on his part and therefore no defalcation and no liability.

There is an abundance of authority suggesting that Davis acted in a fiduciary capacity to Global under the trust agreement by virtue of being a major stockholder, director and president of Davis Investments and because of his personal liability under the indemnity clause.

According to *Scott on Trusts*, a director or officer of a *corporate trustee* "is under a duty to the beneficiaries to use reasonable care in the exercise of his powers and the performance of his duties as such director or officer." 4 *Scott on Trusts* § 326.3 at 307 (3d ed.1967). The

director or officer who negligently causes the breach of trust "is personally liable to the beneficiaries for the loss." *Id.; see also Strauss v. United States Fid. & Guar. Co.*, 63 F.2d 174, 178–79 (4th Cir.1933) (holding that directors of a South Carolina trust company were personally liable after knowingly participating in violation of trustee's fiduciary duties); *McLean, Koehler, Sparks & Hammond v. Hildebrand (In re Hildebrand)*, 230 B.R. 72, 77 (Bankr.D.Md.1999), *citing Woodworking Enter., Inc. v. Baird (In re Baird)*, 114 B.R. 198, 203–04 (9th Cir. BAP 1990) (citation omitted) (highlighting the personal liability of corporate directors whose breach of trust causes loss for beneficiaries); *Wilcoxon Constr., Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 522 n. 2 (Bankr.D.Md. 1995) (citations omitted); *Hemelt v. Pontier (In re Pontier)*, 165 B.R. 797, 799 (Bankr.D.Md.1994), *citing Tedrow v. Deskin*, 265 Md. 546, 550, 290 A.2d 799 (Md. 1972).

A number of bankruptcy decisions hold that an individual debtor who has served as an officer, director or stockholder of a corporate fiduciary and has permitted the corporation's misappropriation of trust funds is personally liable for the beneficiary's loss, and the debt is excepted from debtor's discharge under § 523(a)(4). *See* discussion and citations *infra*.

A recent ruling on point is the unpublished opinion of District Judge Morgan of this district in *Merchant's Express Money Order Co. v. Harrell (In re Harrell)*, Civil No. 2:97cv971 (E.D.Va.1998), *aff'd* 173 F.3d 850, 1999 WL 150278 (4th Cir. Mar. 19,

---

3. "The creation of an express trust must include the following essentials: first, a subject matter for a proper trust; second, a person competent to create a trust; third, one capable of holding the property as trustee, and fourth, a person for whose benefit the trust property is held." *Waesche v. Rizzuto*, 224 Md. 573, 168 A.2d 871, 875 (1961), *citing Sieling v. Sieling*, 151 Md. 536, 135 A. 376, 382 (1926); *see generally* 1 Bogert & Bogert, *Law of Trusts and Trustees* § 1 (2d ed. rev.1984)(detailing the basic terminology and classifications associated with trust law).

1999) (unpublished). The issue in *Harrell* was virtually identical to that here, as were its facts, *e.g.,* the personal liability of a debtor as corporate officer and indemnitor for losses under a money order trust agreement. Judge Morgan held (1) that there was an express trust (under Pennsylvania law) between debtor's corporation as trustee and the money order company as beneficiary; (2) that a defalcation did not require intentional misconduct; (3) that there was a defalcation when debtor's corporation placed the trust funds in its operating account and failed to remit them to the beneficiary; (4) that debtor participated in the misappropriation of trust funds, had personally guaranteed the corporation's full performance of the trust agreement, and as corporate officer, director, and most importantly, controlling shareholder had made key decisions for the corporation including the decision not to remit the funds to the beneficiary; and (5) that as a result of his actions, debtor became personally liable for the defalcation, which obligation is excepted from discharge under § 523(a)(4).

In *Harrell,* the Virginia district court relied in part on a similar bankruptcy ruling by a Maryland district court in *Pan American World Airways, Inc. v. Folliard (In re Folliard),* in which the same conclusion was reached that a misappropriation of trust property by a corporate officer makes the officer liable on a personal basis for the breach of trust. *See* 10 B.R. 875, 876–77 (D.Md.1981); *see also Hodnett v. Loevner (In re Loevner),* 167 B.R. 824, 826 (Bankr.E.D.Va.1994); *Mostiler v. Couch (In re Couch),* 100 B.R. 802, 808 (Bankr. E.D.Va.1988); *Bellity v. Wolfington (In re Wolfington),* 48 B.R. 920, 923 (Bankr. E.D.Pa.1985); *Sun Life Ins. Co. v. Koszuth (In re Koszuth),* 43 B.R. 104, 107 (Bankr.M.D.Fla.1984) (stating that debtor who knowingly causes misappropriation is personally liable regardless of whether he profited personally). *But see Marchiando,* 13 F.3d at 1115–16; *Barclays American/Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 878–79 (8th Cir.1985).

Furthermore, there is also reinforcement in recent bankruptcy case law of the basis for finding personal liability on the part of a corporate officer or fiduciary such as Davis. The following excerpt outlines a persuasive policy argument in favor of imposing personal liability on corporate fiduciaries:

> If the fiduciary relationship is not imposed upon the corporate officer charged with maintaining the fiduciary relationship, then § 523(a)(4) could be rendered meaningless in cases where the fiduciary relationship is established between a creditor and a corporate fiduciary only. All the debtor would have to do to avoid § 523(a)(4) is place the corporation in the position of the fiduciary rather than himself.

*Woodall,* 177 B.R. at 522 n. 2 (citations omitted).

 The court rejects Davis' defense that even if he was a fiduciary he did nothing wrong in that capacity. Defalcation is defined as "the slightest misconduct, and it need not be intentional conduct; negligence or ignorance may be defalcation." *Bailey v. Sonnier (In re Sonnier),* 157 B.R. 976, 984 (E.D.La.1993), *quoting Morales v. Codias (In re Codias),* 78 B.R. 344, 346 (Bankr.S.D.Fla.1987) (citation omitted); *see also Hanes,* 214 B.R. at 813, *citing Old Republic Surety Co. v. Richardson (In re Richardson),* 178 B.R. 19, 27–30 (Bankr.D.D.C.1995), *aff'd,* 107 F.3d 923 (D.C.Cir.1997). Further, "[a] defalcation under § 523(a)(4) is 'misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds.'" *Pahlavi v. Ansari (In re Ansari),* 113 F.3d 17, 20

(4th Cir.1997) (alteration in original), *quoting Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1460 (9th Cir.1997) (citation omitted). However, "[a] 'defalcation' ... does not have to rise to the level of 'fraud,' 'embezzlement,' or even 'misappropriation.'" *Pahlavi*, 113 F.3d at 20 (citations omitted).

The court finds that Davis was well aware that Global's trust funds were being commingled with Davis Investments' operating funds and used for general purposes of the business; this was a defalcation, and it was permitted by Davis. He is wrong in saying that he did not personally gain from his corporation's use of the funds; if nothing else, he used Global's funds to keep his corporation in business. The business failed soon after Global terminated the contract.

A separate judgment order will be entered excepting the Global debt of $71,168.55 from David T. Davis' discharge pursuant to 11 U.S.C. § 523(a)(2)(B) and (a)(4). The complaint will be dismissed as to Margaret S. Davis.